Case number 19-3034, Dane Chisholm v. St. Mary's City School District et al, and case number 19-3100, Reid Liniger v. St. Mary's City School District et al. Argument not to exceed 20 minutes per side. Mr. Weicker, you may proceed for the appellant. Mr. Weicker, you may proceed for the appellant. May it please the Court, my name is Mark Weicker, I am counsel for Appellants Dane Chisholm and Reid Liniger in these cases consolidated for the argument. I'd like to reserve two minutes for rebuttal. The appellants in this case are requesting reversal of the District Court Decision Granting Summary Judgment on the Title IX claims which were brought against the St. Mary's City School District Board of Education and on the IIED claims which were brought against the individual school appellees. There are three primary issues we believe to consider. First is whether Title IX was violated when a football coach was profusely referred to high school student athletes as pussies. The second issue is whether or not the Board of Education in this case had actual notice of the harassment when the coaching question had a long history of identical harassment and were the appellants in this case were harassed in plain sight. The third issue to consider is whether the school was harassed when the school rehired the coach despite his long history, when they failed to disclose his history to the third party investigator that was assigned to investigate the appellant's complaints, and when the school and the investigator failed to apply the school's harassment policy to the appellant's complaint. So you have to fail on all three of those to succeed? That's correct. Yeah, that's the standard articulated in the Davis case, Your Honor. And so do you want to start with the first one, I think, which is essentially whether there was sex discrimination here? Yes. I would point out, Your Honor, that the Davis case and the Gebser cases, 1998 and 1999, set the standard for these types of harassment cases, Title IX harassment, and that they indicate in those cases that teacher-student harassment is viewed slightly differently than peer-to-peer harassment cases. And in the Davis case, the court indicated that peer harassment in particular is less likely to satisfy the requirements for Title IX as teacher-student harassment. And then here, of course, we're looking at the coach's behavior and how the school responded to it. And to answer your question, Your Honor, in regards to the first element, this fits under Title IX, or we believe fits under Title IX gender discrimination because of the language that the coach chose to use here. Just one word. You've lended this case to the one word now. That's my reading of your briefs. For the most part, yes, Your Honor. There are really two different insults. Now, the word pussies was used consistently throughout complaints that were made against the coach at St. Mary's and elsewhere. And then another demeaning term that was used with appellant Reed Lininger was he called him a rich, spoiled, pretty boy pussy. A rich, spoiled what? Pretty boy pussy. But it's the use of the last word that you're relying on. If you just called him a rich, spoiled, pretty boy, would you still be... Well, we would submit that pretty boy is also gender implicating as well. And I would point out also that... If they said all that, but instead of saying pussy, they said... Baby. Baby, or mama's boy, or cat, or chicken, or something like that, then it might be egregious so it wouldn't be Title IX. Is that... That's correct, Your Honor. I think that's fair. It's pretty bad stuff to be doing. You don't have to tell me, but that's putting an awful lot of jurisdictional weight on nuances of cuss words, basically. It seems like a very finely drawn distinction as to whether you litigate these things in the federal court under Title IX versus litigating them in a state court or in the school board or on appeal from a school board decision or something where you could talk about the real underlying issues of whether this is the way we want our athletes to be treated. But if they happen to use a few magic words, then all of a sudden it becomes a federal Title IX case. That's basically what you're asking us. We've got to look at these words and see just how sexually loaded they are in order to determine which form this kind of issue is decided in. That troubles me, I have to say. Can you address that? Yeah, I recognize that, Your Honor. I would say that the coach in this case directed these insults at the minors because he knew that it struck right at their hand. I think this was deliberate. I think what we have, which is very unique in this case, is this 20-year history of harassment by this coach where it's been documented. You could have a 20-year history of using those other words, too. That's correct. So I'm talking about drawing the line at the particular word. It's sort of like George Carlin. We're going to have a list of forbidden, not forbidden words, but a list of words which gets you into Title IX federal court. And if you don't use those words, you can be just as bad. But you don't get into Title IX federal court. I think it's the equivalent of Title VII where certainly some types of harassment or demeaning behavior or words that are used in the workplace do not implicate Title VII, but certain words do as they relate to race and other protected classes. And here with Title IX, again, this was deliberate and intentional by the coach. It was striking at these players' manhood, which was offending to them, and it was gender stereotypical. By all means, we recognize and appreciate that coaches will use certain tactics to motivate their players. We're not saying that he can't call them slow or weak or lazy or pathetic. We're not even saying that he shouldn't be able to curse at them. What we're saying is that he shouldn't be able to duplicate their gender by calling them pussies because, number one, it offends the player's sense of masculinity, and that's gender stereotypical and offending to, of course, females. So it also perpetuates the stereotype. Again, this is a coach in a position of authority who his players look up to, and especially this coach. He had a long history of winning, and that's why it brought him back to St. Mary's even knowing that. There are certainly quorum issues. I think Judge Rogers touched on those already. Title IX is about sex discrimination, and so one of the obvious questions here is that there are no women in the picture whatsoever. So usually it's sex in favor of men in favor of women, women in favor of men. It's a football team, a male coach and a male football team. There are no women in the equation. So it doesn't line up all that well with your traditional sexual harassment, Title VII, Title IX sex discrimination case. Although I would submit, Your Honor, that Title IX doesn't require a comparable in the same way that Title VII does. It requires discrimination on the basis of sex. Correct. I understand your claim to rest on the stereotyping issue. Is that correct? That's right. That's correct. Okay. So what about your plaintiffs was identifiably not stereotype conforming? The coach indicated that he did this to motivate the players because they were not tough enough. So it's this toughness element. Of course, again, we recognize and appreciate that there is an art to coaching high school football players and that it requires, you know, motivation and sometimes it requires yelling and screaming. But what he was doing and the reason he was doing it, he was trying to squeeze every ounce of femininity, which this is in the coach's perspective, femininity out of these players. And he did it by using this derogatory term directed at the players. And again, so other players used it and they continued this. This was an environment where this coach was allowed and other players and other coaches used the same terms. But I would also point out, and this is very important in this case, that this isn't just a subjective idea. Of course, the appellants here testified that this was about their masculinity, both appellants. And I would say their teammates, who also complained about the coach, testified that it was about their masculinity. The former complaints about the coach at St. Mary's and elsewhere indicated that he used this particular term. And importantly, the school's policy prohibited this particular conduct. The sexual harassment policy, the harassment and sexual harassment policy were together. It's policy 55-17 in the record, prohibited this particular type of conduct. We didn't choose it. I don't see where that gets you, though. I would think that a school would prohibit all kinds or many kinds of humiliating, degrading words thrown at our young athletes, students. I mean, that doesn't mean that it's all of a sudden a sex stereotype. He calls him a sissy or he calls him a weakling or he calls him a cower or he calls him a mama's boy or he calls him a sissy. You're saying, well, one or two of those are bad, but the rest are okay. But the policy would legitimately ban all of them. So I don't see how saying it's against the policy puts it in one category versus the other. Yes, Your Honor, there are two distinctions that we would make. First, and I want to read the policy language, it's conduct which includes sexual overtones and is intended to create discomfort or humiliation. And then secondly, the policy prohibited verbal aggression, intimidation, or hostility based on sex or sex stereotyping that does not involve conduct of a sexual nature. And this is in the sex harassment policy, and it didn't come out of thin air. I understand. I don't see where being in the policy gets you anywhere because being in the policy could easily cover things that don't trigger Title IX. Well, let's just say, well, the policy bans this or the policy divides that. Was this the Title IX policy? This was the sexual harassment policy, Your Honor. And also importantly, that language comes directly from Title IX guidance. So in 2001, the U.S. I'm sorry. Let's look at the guidance then. Well, the guidance says from 2001, it prohibits verbal aggression, intimidation, or hostility based on sex or sex stereotyping that does not involve conduct of a sexual nature. It comes right from Title IX. So, again, we didn't make this up. The school never considered their policy. The district court never addressed it even though it raised it. What is the discrimination based on sex?  It's not favoring men over women or women over men. Correct. I disagree with that. The coach has indicated that females are less than something because he's calling the players a derogatory term for the female inhabitant. There's no woman who has been discriminated against. There's no women in this context. And one of the things I'll call is that we have to consider the context. So it informs two things. One, this is an all-male activity. And two, the football field is different than the Spanish club or the debate team where this language is – this might be beyond pale in terms of what we want to hear, but certainly the environment is more combative and aggressive than some other places. Again, I respect that, and we understand that coaching brings on some different challenges. You're not saying that the coach has hostility towards men. No. You're not saying the coach has hostility towards women. Any bit of femininity that these men have exhibited, he would call them this word. Because he's hostile to women? I'm sorry? Because he's hostile to women? Yes. He's saying women are less than men because they are weak or they are not strong enough or not tough enough. These are impressionable young high school athletes who look up to this coach who also perpetrate this stereotype out in the world in their interactions with anybody else in the school. Well, I think what you're saying is that he was hostile to men who have female traits. That's correct. It seems to me that thing stays very clear. That's the nature of your claim if you want to win. You've got to say that he's treating people differently because they don't look manly in the way he thinks they should look manly. Or don't act manly. Don't act manly. The difficulty I have with that, I can see that if he said you can't play football if you wear lipstick. That would fit more clearly. You're doing something that women do. I don't think you should do it. So I'm not going to let you play or something like that. But when you talk about how tough you are, he's assuming that women as a whole are not as tough. There's a stereotype of women as not being tough. And so in order to be tough, you've got to be a man. That's right. And that's a type of mind violation. That seems a step further, at least in my mind, from saying you can't wear earrings. That is no doubt a stereotypical as well. Yeah, but I'm saying that would be a lot clearer than saying you demand toughness. And in your mind, toughness is associated with manliness. So therefore, when I'm insisting that you be tough, there's a type of mind violation. Then you've expanded this sex stereotyping concern, which I can see would be a concern in certain types of context. And has received some recognition in the courts. But in cases that aren't, I'm trying to make you tough and I associate toughness with men. And so therefore, I'm discriminating against you because I'm trying to make you tough. That just sounds so counterintuitive. And I'm wondering if there's any precedent for something that takes this sex stereotyping that far. Because it's taking it farther than I think these cases – or at least they take it into a different realm. Yeah. That's my concern. I'm telling you right now what my concern is. Right. And, again, appreciated. I would indicate that no cases have pointed to policy language under a sexual harassment policy or Title IX guidance with this particular language. Again, this Title IX guidance is relatively new from 2001. Is it still in effect? Yes. Yes, Your Honor. And the guidance clearly prohibits this type of behavior. And I'll point out also that the guidance came out after the Davis case. The Davis case, of course, set the elements for Title IX sex discrimination. And a lot of the cases, again, we recognize are sexual assault or relationships between teachers and students. So there are some egregious set of facts that relate to sex. When we get these cases, if we agree with you and then we get these cases in the future, we're going to have to look at these word by word. And I don't know exactly how you figure out what a word means. If you ask me what pussy meant in that context, I would say it means weakling. But you say it's okay to call them weakling. But you've looked it up, and in the old English, pussy had something to do with women in particular. And so, therefore, this is a bad word to say weakling rather than an okay word for Title IX purposes. But then we're going to have to have a lot of – we're going to have to litigate sissy and we're going to have to litigate mama's boy. And we're going to have to come up with other kinds of words, words which – should we just use our sense of what the words mean? Or do we have to go and look at English dictionaries or what to see whether they have a feminine connotation? Because basically what he seems to be saying is you're a coward or you're a chicken or you're not tough enough. You're not willing to hit the foe hard enough and using coarse words to say it. But some coarse words are okay and some coarse words aren't. And I ask that question, I see your time is getting short because if it's just what do you judge think that word means, it doesn't carry enough of femininity to me to get you over the line. It just conveys to me chicken-heartedness. And he's not calling him a chicken. He doesn't think he has feathers. He's not accusing him of having feathers. It's just a harsh pejorative aimed at a young man is what it seems like to me. I don't see the femininity part of it, Grant, when you looked it up in the dictionary, which I did. I mean it has those roots. That can't be the basis for figuring out whether it's entitled mind, can it? Yes, I think it can. Your Honor, I would just submit he can call them weak or pathetic or lazy or losers or curse at them. We're not saying that that can't happen. But when you call an individual, in this case a minor, the equivalent of a female anatomy, and then you equate that to not being tough or being weak, that is Title IX harassment. And it's the same situation that you would have under Title VII if you used the N word. Words matter. And words matter especially in the school context when you have someone in a position of authority. And you have a school policy and Title IX. What is the best case that you have that says this? Because even right now the Supreme Court has decided under Title VII where sex includes sexual orientation, that there's a sexual component to that, which are sexual preferences. There's no actual sexual component to this case at all in terms of who someone wants to have a relationship with. So even if that case could go one way or another, I'm not sure that it would inform this question much. What's the best authority for your position? Yes, Your Honor. I would point out that Title IX doesn't include sexual orientation, so we're just talking about gender-based harassment. But I would say the best case is the 2017 case, Tuminello v. Father Ryan High School. I'm sorry, say it again. Tuminello v. Father Ryan High School. And the court decided there – it was based on the pleading standard, but the pleading was deficient in that case. And the court, the district court, wouldn't allow the petitioners to amend their complaint. So it ultimately was deficient because it was pled as a sexual orientation case. But if there was any indication in that complaint based on the court's language that it was gender-based discrimination, then it would have met the pleading standard for Title IX. And I will admit that there – we have an absence of cases that apply to this particular policy language from the U.S. Department of Education. But the language is there and it's clear. And at a minimum, we would submit that a jury should make a decision about whether or not this conduct was violent of both the policy and Title IX. Okay, you've used up your time. You'll still have your rebuttal. And did you want to address the intentional affliction? Well, we would just admit, Your Honor – thank you – that the conduct in question here, the conduct by the athletic director and the superintendent, in first knowing about this history, failing to apply the harassment policy, and then failing to disclose this long, tortured history of this coach's behavior in the past to the investigator, was at least in bad faith or potentially reckless or intentional. So that would abrogate the immunity for the IIED claims. And we'd submit that it's intentionally distressing and would shock the conscience in what the coach did repeatedly, even though he had been reprimanded by school districts and the State Board of Education. He continued this behavior to get what he needed in terms of motivation from the players. So we'd submit that it meets the standard for both the school administrators and the coach for the elements of IIED. Thank you. Thank you. May it please the Court, my name is Tabitha Justice. I'm the attorney for the St. Mary's City School District Board of Education, Superintendent Sean Brown, and Athletic Director James Holman. While I know this Court already understands this, I feel like I have to say it. As Al said, the Board of Education denies the underlying allegations in this complaint that's managed before the Court on summary judgment based upon questions of law. We don't want anything in our argument – I guess I've been here before – to be constituted as admission of any of those underlying allegations. We're accepting them as true only for purposes of summary judgment, right? And accepting as true is a pretty outrageous accusation, isn't it? Right. And the Board of Education would not tolerate the kind of conduct that is alleged in the complaint if the Board actually believed that it had occurred. The Board of Education would not tolerate calling kids loser or idiot or stupid head. As Board General Counsel for many school districts, I've terminated a number of employees for saying exactly those kinds of things. But the long history this coach has – not just in your school district, but other school districts – using the exact same language, the exact same pattern repeating. You had your district high-risk and again, even in your district and others. Was the Board aware of those things and just found them to be unsubstantiated? Well, I think that the school districts investigated those allegations. The school districts prior to us investigated them. And they concluded that yes, he shouldn't do those things. And they reprimanded him and told him he shouldn't say – he should be kinder, I guess, is the parlance today. But he also had strong support in the community for being rehired. The Board of Education answers to the community. The Board of Education was well aware of the Department of Education's reprimands and him telling him you can't do this anymore.  But the Board of Education was also aware that other school districts had maintained him on their employment rosters. And that the Ohio Department of Education, which determines whether or not people are fit to be able to teach or to coach in a school district, had concluded that he was in fact fit to do so. What was the team's record year before he was hired? Well, in the two years before, it was 21 to nothing. Or 0 to 21, I think. 0 and 21. And if I was an attorney, I would be better able to address the specifics. Has the team had pretty good records since he's been there? Yes, it has. But the question that we have here is really, does the conduct alleged – as alleged – fall within the parameters of Title IX or the state law intentional infliction of emotional distress by himself? Let me say that the foundation of the appellant's Title IX argument, in my view, is what is offensive to women. The foundation that the word pussy is a gender-based slur is problematic to me. The word pussy, particularly in an athletic context, is synonymous with scared, soft, weak. What was the first word? Scared. Scared. I don't consider those to be feminine characteristics myself. The appellants testified that Coach Fry would use that term if they didn't hit hard enough or if they weren't tough enough or if they messed up on the field. Without any evidence or presentation to this court of the origins of that word, the appellants argue that the use of the word pussy was specifically directed towards their masculinity because it was used in the context of them being scared or not taking a hit or soft or weak. Well, my folks as a kid would say scared as a little pussycat all the time. And so the fact that they insist that this word pussy is synonymous for femininity is problematic. And I would ask that the court not find that to be the case. I would ask that – Why shouldn't the jury determine that? The jury determine whether or not it is a gender-based slur? Yeah, you view it the way – and candidly, I would view it the way you do too, but I can imagine other people thinking, oh no, that means girl. For instance, the other question I want to ask you, which is related, is what if a football player wanted to wear lipstick and little stud earrings that I would call feminine? And he said no, no girl appearances on my team. That would trigger Title IX or not? I think it would be a closer call. It would be a closer call, but a jury at least could say that that was saying I don't want you to look like the other gender. And keep in mind too, Judge, that Title IX isn't technically violated by the coach. Title IX is violated by the Board of Education. Well, it's because the Board of Education doesn't discipline them for doing these types of things. It's the nature of their claim. So all right. I misspoke, but you get the idea. Right. I do understand, Judge. And I agree. And the same is true for a cheerleader. For instance, if a cheerleader came to complain that the coach told her that she couldn't be a cheerleader because she was too much of a tomboy, she looked too much like a little boy, or whatever it is, I think that those all have Title IX implications. Here's my question because I think I understand your argument. It coheres. But I'm wondering why you couldn't say that the degree to which the word got us into this area that you're talking about where they wouldn't let a cheerleader have a butch haircut or something like that, that why doesn't it get into that? It depends on how people generally treat the word pussy, and that starts to get into a fact inquiry. You may think of it one way. I may think of it another way. Some other court or, more relevantly, student might think differently. Why shouldn't I go to a jury? I do think that the court has to determine whether or not there is initially the elements of the cause of action. It's just so clear that that doesn't raise – it just doesn't get to be a jury issue. Is that the idea? Well, I think that in certain circumstances it would. Right. But I think in this instance there's not – I apologize, Your Honor. Does your argument rest on the fact that pussy is ambiguous? It does not, Your Honor. But the courts have – other courts have concluded and granted motions to dismiss, in fact, on the use of the word pussy in the similar type context saying that this is not a gender – necessarily a gender-related term. And not only that, but even if – To support your argument, some words you could say are gender-specific. It would almost be insulting to say that they're gender. You could say he called her a coward and he meant – he thinks of women as cowards, and so therefore it's gender-specific. But if the court ruled that way, it would be prejudicial or being offensive to women. Right. And that was sort of my – how I initiated my argument. But even if the court does conclude that it's gender-based, a gender-based statement, the courts have concluded that, particularly in the Sixth Circuit and in the Tuminello case, is that even if it's gender-based comments, it still – it has to be more than gender-based comments. The discrimination in the Title IX case has to be because of gender. And this piece is very difficult, as Judge Rago pointed out, because there are no women on the football team. There are no – actually, St. Mary has had a girl on the football team. That's not a human over there. There was no different treatment. Counsel, you can't – I'm sorry. I don't think that it can depend upon whether there are women on the football team. I agree. I mean that has nothing to do with it. I agree. But they have to present evidence that his treatment was because of their gender. They not presented a single bit of evidence that these boys did not meet the – had a non-conforming stereotype – non-conforming – that they didn't conform to gender stereotypes. It's not that they have to show it was because of their gender. Stereotyping is covered, and they have to show that it's because they were non-conforming. And the question is, what do you have to show for that? Can you – can it be sort of – can you bootstrap? Can it be – as soon as somebody uses a gender insult or a gender-related insult or says, you're a pussy or you're scared or whatever, is there immediate liability or does you have to have some connection between that and some consistent observable trait? I think that's the real nut of the case. And I think that under – particularly under Schitt's Creek precedent, you do have to have an observable trait and that both of these boys, neither of these young men, had any. In fact, they acknowledged that they all both were very stereotypically male boys on the football program. It's better to distinguish the lipstick example than that. Exactly. Exactly. Also, in a non-conforming setting, I think you'd say – so in the workplace, there's a man who's exhibiting feminine characteristics and the boss discriminates against that person. But if a woman were to display those same characteristics because there's also a woman in the workplace, the boss would not give her a hard time for that. That just seems like it whirls apart from the setting we're in where it's an all-male activity at that time. There's no hostility shown in favor of women against men or in favor of men against women. And then it's in the setting of a football environment. I would think that – and I think those facts would matter even if you're sort of trying to analyze it in a gender conformity rubric. There's no – there's no – there's either no talkable women or no women involved in the activity whatsoever. And there's no indication that the coach wouldn't – had a woman been on the team at a particular time, that he wouldn't have also expected toughness and strength of character and resilience of that woman as well. And that's what we're talking about here. In my view, they are bootstrapping this toughness and weakness and softness to the word pussy to try to come up with a title non-claim. And I've used up my time, and obviously my brief and our briefs address all of the other issues. And I would respectfully ask that this court affirm the district court's opinion. I have one question. If you believe everything that they've alleged and have claimed, why isn't the coach himself – why should the coach himself get summary judgment on the intentional football? And obviously – Why isn't it – oh, I'm sorry. Never mind. That's okay. Thank you. Good morning. My name is William Beach, and I am here on behalf of the Pennant. I'm going to be having trouble hearing you, so please. I'm here on behalf of the Pennant, Coach Paul Douglas Frye, and I will refer to him simply as Coach Frye. I think in hearing the arguments from counsel, one thing that's important to point out is that both of these young men used the same language that they now complain about. They used that language before they ever met Coach Frye, and they used that language after they met Coach Frye and after they were done playing for Coach Frye. So to say that they – You mean that the young people used the language? Yes. Both Mr. Linder – I know. Mr. Linder and Mr. Chisholm both admitted to using this exact same language before they met Coach Frye. With respect, I don't see where that gets you. We're not saying they intentionally inflicted mental distress on Coach. No, I agree with that, Your Honor, but I think it goes to – Coach's relationship to a young athlete is different from what language the young athletes use. I agree, but it goes to the psychic injury. We have four elements. So you're not attacking whether it was outrageous or not. You're talking about how injured they were. Is that the reason? No, I would agree with Judge Carr in his opinion that this was not extremely outrageous behavior. In context? In the context of Ohio law under the elements of intentional inflation of emotional distress. I'm sorry. That's what I thought you were addressing first. No. I just wanted to get that fact out. So we do have one single claim for relief pending against Judge Frye by each of these gentlemen, and it is intentional inflation of emotional distress under Ohio law. And in order to prove that, the appellants must prove four elements. And in their briefing, the appellants, neither one of them, have cited to a single point in the record that supports any one of the four elements of intentional inflation of emotional distress. And what about the fact that one of the players left this team and this coach and went on to another team and proceeded to do well? That was Reed Leininger, and he left because of backlash in the community after his father filed a complaint against this coach. That was done in December of 2015 at the end of his junior season of football. And the backlash came in the form of social media, T-shirts, comments, none of which Coach Frye was involved with. But that was in response to a – sort of as a retaliation field to it. That was in response to a protected activity filing complaint against the coach. And the complaint was generated – or the origin of the complaint was the coach's comments. So I think you can still in some ways relate that back to the coach. Right. But in Reed Leininger's case, he continued to work out with the football team up through the date that he left St. Mary's High School and moved to Anna High School on April 1st, 2016. So he continued to work out in a weight room, monitored and directed by Coach Frye. And he admits that Coach Frye did not retaliate against him in any way after the complaint. And there is no evidence in the record that Coach Frye retaliated in any way against either of these athletes after the complaints were filed with the school. So based on the record, I see there is a complete absence that Coach Frye intended to cause emotional distress or that he knew or should have known that his behavior would cause emotional distress. He was a coach. He was there to make these young men physically and mentally tougher so that they could compete in a very physical and violent game, one in which if they're not prepared, they're more likely to be injured. Does the conduct have to be extreme and outrageous under Ohio law? Yes. In fact, it goes to the point that – Isn't that your easiest argument, that it wasn't extreme and outrageous within the context? Yes, and that's where Judge Carr stopped. He didn't even address the other three elements. I mean, this man has been repeatedly told – and this is taking everything in a light and stable relationship – he's been repeatedly told that this type of conduct and this language is not acceptable even in this context. And I think it was also pretty obvious that it was bothering them and that it was getting to them. I mean, what? Well, the coach has been a head coach since 1986 with the absence of – He's been a head coach since what? 1986, and there have been three complaints lodged against him. Maybe if you spoke directly into your – The coach has been a head coach since 1986, and he has had three complaints lodged against him. Two of them were just in the form of a reprimand from his athletic director or superintendent in 1995 and 1999. In Guadalcanal in 2012, he got overly animated after a loss, and for that he signed a consent agreement with the Ohio Department of Education. So three incidents over a more than 25-year period, I don't think, constitutes a pattern. And I don't think it constitutes extreme and outrageous behavior on his part. And if we want to put this into the context that you have mentioned in the oncology case, Dane Chivlin, who was one of the appellants, indicated that all of this happened in the context of football, in football practice only. There was nothing outside of football. And I actually read my interview and agreed with that as well. But the outrageousness, going to your point, Judge Rogers, should not go to a jury because that is a question of lawful determination by the court. And there is nothing in the record that indicates that this is outrageous to the level of intentional infliction of emotional stress. And that's exactly what Judge Carr found when he granted summary judgment. Further, on the last two. Would it be possible, I mean, if you have a coach who picks out a couple of players and is just constantly riding them, can that constitute intentional infliction? If a coach were to use such threatening language as was used in the Tear case, I would say that's a potential. In the Tear case, which was cited by the appellants, there was a direct threat by a teacher upon a 13-year-old girl that her family was going to be hung in her front yard, and that their bodies burned. I understand that there's a distinction between that case and this, but without making threats, just riding the athlete as hard as possible, I mean, with the intent to break the person and make them obey you, can that constitute intentional infliction? I think only if the coach intended harm upon the individual, rather than trying to break them or discipline them in a football or athletic context. Here, there is no evidence that this was anything outside of football practice or trying to make these two young men better football players and more competitive on the football field. So as long as the purpose relates to the sport, you can't, no matter what? I wouldn't say no matter what, because like I said before, if there was a direct threat... I mean, you'd have to do with physical assault or something. Yes, that would certainly amp it up to another level. I'm not saying it can't happen, but I'm saying under the circumstances we have before the court, it certainly did not happen. Sometimes a classic case that you might treat in court law, for instance, is telling somebody that their parent is in the hospital when their parent is not in the hospital. If you did that for sport reasons, it wouldn't matter. It still would probably be intentional infliction of mental distress. Say your father got hit by a truck and you go to the hospital, quit practice and go to the hospital. I think that goes beyond the realm of coaching. Way beyond the realm of coaching. Right. And on to Elements 3 and 4, as my time runs down here, there is no evidence in the record of any psychic injury on behalf of either of the appellants. In fact, the record shows clearly evidence that neither have any type of psychic injury. In the case of Reid Langer, he went to the doctor twice while he was at Anna High School. Once after he punched his brother in the head and broke his hand, and once after he broke a finger. And this was 6 and 12 months after he last played for Judge Fry. And in his medical history, he denied any type of emotional distress or mental anxiety. On behalf of Dean Chisholm, he entered the Army, delayed enlistment program, at the end of his junior year of high school, while he was still playing for Coach Fry. At that time, he denied any emotional distress. And when he graduated from high school, he had to complete and update all of his medical forms, all of which denied any type of psychic injury or emotional distress. So Elements 3 and 4 simply are contradicted by the evidence in the record. If there are no other questions, I will end on that note. Thank you very much. I'd like to return to something Mr. Beach mentioned, and this is the history of harassment. Again, placing this in context, I don't know where three reports of harassment come from, but we count at least eight, and that includes one at DeSiris City Schools, in which the coach was written reprimand in regards to being demeaning to players and becoming physical with another player. The next one was a complaint made by Jim Holman, who is an appellee in this case, the athletic director, against Coach Fry when Coach Fry was at St. Mary's the first time. This was around 2001. The record reflects that Jim Holman said that Coach Fry, and Jim Holman was an assistant coach again at the time, said that Coach Fry was calling students demeaning names, including the word pussy, and was disregarding injuries of players. He submitted a written report to the Board of Education, the appellee in this case, at St. Mary's, and that written report was not followed up on. Nothing was done. Jim Holman left the school district. Next, at Wapakoneta, Coach Fry was recorded by an assistant coach being demeaning to players. I think your time is going to run out, but I think you can get this through. Is there any legal points you want to make?  This was a history by this coach of doing this to players. It had been reprimanded by school districts and the State Board of Education. Four police reports were filed by four different students at Wapakoneta, and he continued to do it, and the school brought him back, and they knew where he was going to do it. That's where the IIED claims come in regards to the athletic director, Jim Holman, who knew well about Coach Fry and the superintendent, who brought him back so that they could win football games and then disregarded the— So the evidence seems to say that the coach was kind of a jerk to a lot of players, and these are two players in particular he may be focused on or maybe were more susceptible to—less susceptible to the abuse, but isn't it the case that he was kind of known as a hard ass on everybody? I mean, that was just kind of his way? There's no doubt. Yes? I think there is no problem— Again, we are not asking this court to stop coaches from yelling and screaming and even being demeaning and using words like weak and soft and lazy and pathetic. That's not what we're asking. This is a very narrow holding based on these very unique facts where we have a coach with this tortured history, well known by the appellees in the case, who did this repeatedly and then struck right at these players in the hands of him, trying to squeeze every bit of femininity or exhibit femininity out of them and calling them pussies. That is derogatory and stereotypical and we submit it's covered by the policy entirely. Thank you. Thank you. The case will be seen. Cases.